## BENOIT v. AMERICAN MUT. LIABILITY INS. CO.

### No. 1479.

Court of Appeal of Louisiana. First Circuit.
June 29, 1935.

Porteus R. Burke, of New Iberia, for appellant.

Voorhies & Labbe, of Lafayette, for appellee.

ELLIOTT, Judge.

Eno Benoit, while working for McWilliams Dredging Company in the construction of a spillway, received a severe injury, and claims of American Mutual Liability Insurance Company compensation on said account.

He alleges that his injury has produced in him a permanent total disability to do work of any reasonable character. The accident happened on or about April 14, 1934. He alleges that American Mutual Liability Insurance Company carries compensation insurance for McWilliams Dredging Company; that he was being paid at the rate of $3.20 per day, worked seven days a week, and that his compensation should be based on his daily rate of pay; that 65 per cent. of his daily rate of pay, calculated over a seven-day work week, in amount $14.60, is due him, during the period of his disability, not however beyond 400 weeks.

American Mutual Liability Insurance Company for answer admits that it carries compensation insurance for McWilliams Dredging Company; that plaintiff received some injury at the time mentioned, and for which he is entitled to compensation; but it denies the alleged extent of his injuries and that he is entitled to the amount of compensation claimed.

It alleges that his injury is confined to his leg and that his compensation should be fixed under the provisions of the law for the loss of a leg; that it has paid plaintiff all that he is entitled to.

Further answering, defendant alleges that plaintiff, at the time of his injury, was working on a federal project under rules and regulations prescribed for such work by the National Industrial Recovery Act of Congress (48 Stat. 195). That at the time of injury, his actual earnings were 40 cents per hour, not to exceed 30 hours per week, or $12 per week maximum, etc.

It prayed that plaintiff's demand be rejected.

The lower court classed plaintiff as a permanent total disability, unable to do work of any reasonable character, and fixed his compensation at $12.48 per week for the period of his disability, not exceeding 400 weeks.

Defendant has appealed. The judge a quo in his reasons for judgment discusses the case very fully. It would serve no useful purpose to enter into a discussion of the testimony concerning the nature of the leg injury which the plaintiff received. It was severe; there is no dispute on that subject. The dispute is whether the injury received at the time stated extended to and disables his hip. The plaintiff contends that it did, and that hip disability exists; the defendant denies it.

Plaintiff's averment on the subject is "that as a result of said injuries his hip and pelvic region has been affected in

that the leg swings in an abnormal position."

Dr. E. S. Hatch examined plaintiff, made a statement as to what he found, and says nothing about any injury to the hip; evidently he did not notice any.

Dr. Hamilton says on the subject: "X-ray of hip joint shows upper fragment of femur turned inward slightly." In a later part of his statement he says: "As a result, patient is unable to walk without the aid of crutches, and in as much as his condition is of long duration, April 14th, 1934, no improvement may be expected from nature, and as Mr. Benoit is a laboring man I consider him totally disabled in his present state to perform common labor as a livelihood."

How much of this opinion, if any, is based on hip injury, we have no way of determining, but we consider it a proper inference that the entire injury was taken into account.

The plaintiff was asked:

"Q. Do you have the full swing of your leg backwards and forward from the hip joint? A. No, I feel something stopping it.

"Q. Would you mind standing up and show the court, with the aid of your crutches, the swing of your leg from the hip joint?

"Witness stands, with the help of his crutches, swings his right leg and says, 'I feel something stopping it here' (pointing at the hip)."

He also declared he had pains and cramps in his hip once in a while.

The lower court had the benefit of a personal examination of the plaintiff and in his reasons for judgment says: "The document marked Exhibit, p 2, shows unmistakably and as testified to by Dr. Hamilton, that the hip joint is turned inward, practically resulting in what is tantamount to a dislocation." To what extent, if any, this statement is based on personal examination or on the evidence of physicians, we do not know, but the fact must have been evident to the court, otherwise such a statement would not have been made.

■ There is contention on the part of defendant that plaintiff should submit to the amputation of his leg. It is well settled in the jurisprudence of this state that an injured party is not obliged to undergo the amputation of his leg in order that his disability may thereby be determined, for purpose of fixing his compensation.

In Franklin v. Ernest Roger Co., 2 La. App. 764, and Jones v. Lake Charles Compress & Warehouse Co. (La. App.) 153 So. 347, it was found that plaintiff, in addition to serious leg injury, had sustained an injury to his hip, and that even if the leg had been amputated, plaintiff would not be thereby restored to the usefulness of a one-leg man.

■ The lower court states that the plaintiff has a hip injury, and we infer from what he says that it helps to disable him; that plaintiff is because of a permanent total disability unable to do work of any reasonable character, and the evidence on the subject does not justify us in holding that the court erred.

■ How plaintiff's compensation should be computed is also a matter of dispute, and the lower court, in acting on this phase of the case, thought that some of the decisions of this court were not in harmony with decisions of the Supreme Court and the other Courts of Appeal.

Plaintiff's injury was received while working on a federal-aid project.

B. P. Lemoine, manager of the re-employment office in the parish of Iberia, testified that the spillway work in which plaintiff was employed was being done under the National Industrial Recovery Act, a public works project. That the McWilliams Dredging Company was doing the work under contract from the War Department, under supervision of the Army Engineers and subject to the rules of the National Recovery Act. We quote a part of his testimony:

"Q. Do you know how many days a week and how many hours each day the plaintiff was working at the time of the accident and at what rate of pay? A. When this work first started, the rules under which they were allowed to work were, not to exceed thirty hours per week At that time, it required a change of crews every three days, and in order to save employee's transportation of going back and forth, the different offices in this district took the matter up with the U. S. Government in view of allowing the employees to work a 30 hour week, beginning on Wednesday morning until Saturday at noon, and then to begin a new week Saturday noon and to end Tuesday evening, which allowed a man to work 28 hours

per week or fifty-six (56) hours for two weeks, requiring the employees to lay off seven days."

"Q. Accordingly, what would the plaintiff receive for the work that he performed from Wednesday morning, to Saturday noon? A. Not over a maximum of $12.00, which is thirty hours at 40 cents an hour.

"Q. And the new week started when? A. Saturday at noon and continued until Tuesday evening.

"Q. And that was the way that the plaintiff was employed and was working at the time of the accident? A. That is the way all the employees worked."

We understand Mr. Lemoine to say that under the agreement of hiring in force under which plaintiff worked, he received 40 cents an hour, worked eight hours a day and seven days consecutively, which of course included Sunday. Mr. Lemoine also says that seven days of consecutive work were, under the arrangement for spillway work, regarded as two weeks of 28 hours each. That the employees during said time worked 56 hours.

The testimony of the plaintiff and that of Mr. Lemoine is practically the same, except that plaintiff testifies that: "I would get $14.60 for the whole seven days, including, Sunday."

"Q. Out of the amount that was coming to you, they deducted a certain amount for board and lodging? A. Yes, that was clear $14.60.

"Q. But you were making 40 cents per hour? A. Yes, 40 cents an hour."

The employment situation in the present case is similar to that which existed in Suire v. Union Sulphur Co. (La. App.) 155 So. 517. The decedent Suire was not working on a federal-aid project as the plaintiff Benoit was doing, but Suire's employment under which he was working at the time of his death was pursuant to rules and regulations prescribed for the work in which he was engaged by the National Recovery Act of Congress. At the time the Suire Case was before the court, this act had not been declared unconstitutional. It is common understanding now that it has been declared unconstitutional by the Supreme Court of the United States. Schechter Poultry Corp. v. U. S., 55 S. Ct. 837, 79 L. Ed. ——. The act has been pleaded by defendant as the governing law in this case, in so far as concerns the employment and hours of labor on federal-aid projects. The plaintiff has not attacked the act as unconstitutional and it has not been repealed; consequently in so far as concerns the present case, we feel that to the extent that its provisions apply, we must give effect to the provisions of the act as the supreme statutory law on the subject. Section 206 of the act (40 USCA § 406) contains a provision which, so far as pertinent, reads as follows: "so far as practicable and feasible, no individual directly employed on any such project shall be permitted to work more than thirty hours in any one week." The provision "so far as practicable and feasible" contemplates hiring, working, employment, hours of labor suited and adapted to the kind of work being done, the locality, etc. The provision "no individual directly employed on any such project shall be permitted to work more than thirty hours in any one week" is not a peremptory mandate restricting all work, to no more than 30 hours in any one week, when such a limitation of hours in any one week would be for any reason impracticable and not feasible. It is our conclusion that an agreement of the kind under which plaintiff was working was permissible under the act for spillway work.

Employers' Liability Act of this state, section 8, subsec. 1, par. (d) 18, subsec. 2, par. (K) 3 (amended Act No. 242 of 1928 [pages 358, 361]), reads as follows: "The term wages as used in this act is defined to mean the daily rate of pay at which the service rendered by the injured employee is recompensed under the contract of hiring in force at the time of the injury, and anything herein contained to the contrary notwithstanding the maximum compensation to be paid under this act, shall be twenty dollars per week and the minimum compensation shall be three dollars per week; provided that if at the time of the injury the employee was receiving wages at the rate of three dollars or less per week, then compensation shall be full wages." The language "the daily rate of pay at which the service rendered by the injured employee is recompensed under the contract of hiring in force at the time of the injury" was considered by this court in Durrett v. Unemployment Relief Committee, 152 So. 138, and Young v. Unemployment Relief Administration, 154 So. 642, and also in Suire v. Union Sulphur Co., 155 So. 517.

We had averaged the time per day and per week in several cases for the purpose of fixing compensation where the injured party, due to inability on his part to get full time employment, had only been given work for part of a week; but since the decision of the Supreme Court in Rylander v. T. Smith & Son, 177 La. 716, 149 So. 534, in which the court held that the Employers' Liability Act as it now stands contemplates six days as a working week, although due to unusual economic conditions, injured party had not been able to get work for that number of days in the week, we now accept as correct that normal employment under Employers' Liability Act contemplates a six-day work week for the purpose of fixing compensation as held by the Supreme Court. The Calhoon v. Meridian Lumber Co., 180 La. 343, 156 So. 412, is very plain and leaves no room for further difference of opinion on that subject. We do not consider, however, that any conflict exists between the decisions in the Durrett, Young, and Suire Cases and the cases cited in the opinion of the lower court as holding differently.

In the Durrett Case, Durrett, while working under a state agency which had been set up by the state for the relief of the unemployed, sustained injury and brought suit against the Zurich General Accident & Liability Insurance Co., Ltd., carrier of the compensation insurance taken out by Unemployment Relief Committee. Under the rules and regulations of the Emergency Relief Committee which governed in the matter of employment and which, as we have stated, was a state agency, Durrett was allotted but two days' work in a week. He contended, however, that he was entitled to compensation as if he had worked six days in the week. In acting on that phase of the case, we said (152 So. 138, at page 140): "Obviously, therefore, there could be no such thing as a six-day work week for any of them." Durrett had agreed to employment of that kind and for that number of days. Giving effect to the agreement between Durrett and the Unemployment Relief Committee, that is, to the contract of hiring in force at the time of the injury, we held that $3 per week was the most that could be allowed him under the law. In Young v. Unemployment Relief Administrator, 154 So. 642, the legal and factual situation was practically the same as existed in the Durrett Case, ex-

cept that the injured party had been allowed but one day per week. The opinion in the Young Case followed that in the Durrett Case.

But in Suire v. Union Sulphur Co. (La. App.) 155 So. 517, 520, a different situation existed. The party Suire whose death gave rise to the suit had sought and been given employment under the rules and regulations of the National Industrial Recovery Act, the same under which Benoit was working. There is no difference in principle between the present and the Suire Case, except that Suire was working under the Code of Fair Competition for the Petroleum Industry. But that fact does not differentiate the legal situation from that which exists in the present case.

In the Suire Case we said: "At the time the decision of the Supreme Court in Rylander v. T. Smith & Son, Inc., and that of the Court of Appeal in the King Case [144 So. 283] was handed down, this act of Congress * * * had not been adopted and was not the law, nor had the state agency known as the unemployment relief committee been organized."

We understood that the Rylander and King Cases were based exclusively on the provisions of the Employers' Liability Act and dealt with injury in the trades, business, and occupation provided for in that act. The Durrett and Young Cases were injuries received while working under Emergency Relief Agencies set up and put in force by the state, and which did not contemplate normal employment, such as Employers' Liability Act contemplates, and which formed the rule recognized in the Rylander and King Cases.

Calhoon v. Meridian Lumber Co., 180 La. 343, 156 So. 412, 415, is based on the same situation as existed in the Rylander Case. In the Calhoon Case the court said: "It seems that for several months prior to the accident, plaintiff's employer, because of the economic situation, had been working its crews only half time, or three days per week." Jones v. Southern Advance Bag & Paper Co. (La. App.) 157 So. 754, is based on a situation similar to that which existed in the Rylander and Calhoon Cases.

The National Industrial Recovery Act, rules and regulations therein contained, and the rules and regulations governing employment by the Unemployment Relief Committee and Administrators, etc., were not involved or discussed in the Rylander

Case, nor in the King, Calhoon, and Jonès Cases, but the rules and regulations of the Unemployment Relief Committee, etc., were involved in the contract of hiring and employment in the Durrett and Young and those of the National Industrial Recovery Act were involved in the employment of Suire and the plaintiff Benoit.

We firmly believe that our decisions in the Durrett, Young, and Suire Cases are sound and correct and that this case comes squarely under the ruling particularly in the Suire Case; that the plaintiff, having agreed to a three and one-half days' work week, that constituted the contract of hiring under which, as held in the cases above referred to, his compensation has to be based on. The method of combining two three and one-half days' work week into one, and the laying off work for two similar periods, was just an arbitrary means evolved for the purpose of convenience and saving transportation costs to the employee. It did not affect the amount of wages received by the plaintiff one way or the other.

How the amount of compensation was based on a six-day week in this case, we are unable to understand. The plaintiff either worked two weeks of three and one-half days each, or he worked one week of seven days. Were he entitled to compensation in the latter case, which we hold he was not, it would seem that his compensation should have been based on a seven-day rather than a six-day work week. To allow compensation based on a seven-day work week, it would be found by a simple arithmetical calculation that the plaintiff in this case would receive $3.36 more per week in the way of compensation than he would have received in the way of wages while actively engaged in work. We cannot make ourselves believe that the Legislature had any such intention in enacting our compensation statute. Under that interpretation of the law, it would pay an employee well to get injured on a job as soon as he could after taking it. In other words, the result would be to place a premium on accidents and to invite employees to be hurt while working.

Under our view of the case, therefore, the judgment appealed from will have to be amended by limiting the plaintiff's compensation to a three and one-half days' work week. As already shown, he worked eight hours per day, and consequently, at three and one-half days per week, he worked twenty-eight hours. He received 40 cents per hour, and consequently earned $11.20 per work week. He is therefore entitled to compensation at the rate of 65 per cent. of $11.20, or $7.28, per week during the period of his disability, and not $12.48 as allowed in the lower court.

For these reasons, it is therefore ordered that the judgment appealed from be, and the same is hereby, amended by reducing the amount of compensation from the sum of $12.48 per week to the sum of $7.28 per week, and as thus amended, that it be affirmed.